In the Matter of PHOENIX STEEL
CORPORATION, Debtor.

PHOENIX STEEL
CORPORATION, Plaintiff,

v.

PHILLIPS PETROLEUM COMPANY,
Defendant–Counterclaimant

v.

PHOENIX STEEL CORPORATION,
and Francis J. Norris,
Counterclaim Defendants.

Bankruptcy No. 87–147.
Adv. No. 87–52.

United States Bankruptcy Court,
D. Delaware.

July 21, 1989.

See also, Bkrtcy., 82 B.R. 334.

Paul P. Welsh, Vicki A. Hagel, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for Phillips Petroleum Co.

Warren T. Pratt, Drinker Biddle & Reath, Philadelphia, Pa., for Phoenix Steel Corp.

HELEN S. BALICK, Bankruptcy Judge.

Phoenix Steel Corporation filed this adversary proceeding in reaction to a suit filed in the Superior Court of Delaware by Phillips Petroleum Company against Francis J. Norris, a former officer of Phoenix, for $215,387.02. Phillips had earlier filed a proof of claim for the same amount claiming priority status in Phoenix' second Chapter 11 case.

Phoenix asks the court to find that Norris is not liable to Phillips and enjoin Phillips from proceeding against him. Phillips' counterclaim asks for a judgment against Phoenix in the amount of $215,387.02, having priority status in the second Chapter 11 as an unpaid administrative expense from Phoenix' first Chapter 11 case.

The amount claimed by Phillips represents one-half of Phillips' cost of drilling an oil well in 1984 during the first Chapter 11 case. The Phoenix/Phillips' relationship arises from a 1951 assignment by Phillips to Barium Steel Corporation (Phoenix' predecessor) of an undivided one-half interest in a lease Phillips had from the South Texas Syndicate Trust. Under this co-tenancy, each held an undivided one-half interest in the minerals below the top of the Midway Formation.

There was no activity under this lease until 1975 when Phillips in response to a Phoenix inquiry suggested that a farmout agreement to a third party would benefit both of them. On February 3, 1977, they entered into such an agreement which is essentially a retention of a royalty interest. Although the terms of the agreement provided for conversion to a working interest, no conversion was ever made. As a result of this agreement and a subsequent identical agreement, Phoenix received $300 to $1,000 a year but made no expenditures. In '78 or '79, Norris, who was accounting supervisor and who later became Assistant Treasurer, discovered this income. In an effort to properly enter the amounts in the Company's ledger, he inquired of others on the staff and found a document storage box which contained correspondence and the farmout agreements. Attached to each of these agreements was a definitional index of standard terms used in the oil industry. The index defined a royalty interest as the right to receive a share of the production of a well, free of any obligation to pay expenses in connection with that production; and a working interest as the right to receive a share of the production subject to the obligation to pay a pro-rata share of the expenses of the well.

In March 1984, Phillips, without consulting Phoenix, decided to drill a well for two reasons: 1. The South Texas Syndicate Trust (lessor of the mineral rights) issued a demand letter instructing that the region be developed and 2. Numerous Phillips' personnel as a result of new procedures in exploration believed the area to be a good prospect.

On July 26, 1984, Phillips wrote to Eugene Hug, President and CEO of Phoenix, as follows:

> Phillips, as *operator*, proposes to drill the following described well:
> Name: S. Texas Syndicate Tr. Well No. 1
> Proposed Location: 1500' FWL and 1500' FSL of the BS & F Survey A 88
> Proposed Depth: Taylor @9500'
> Estimated Cost: $1,141,000
> Please indicate your approval to drill this well *for the joint account* by signing and returning one copy of this letter to my attention. (Emphasis added.)

Hug asked Norris to review and discuss the letter with L. Allan Fort, Phoenix' executive vice president, and report back to him. Norris, knowing that the royalties Phoenix received resulted from the farmout agreements, confirmed from those

agreements Phoenix' interest in the site to which the proposal referred. A definitional index was not attached to this letter nor did Norris review the attachments to the farmout agreements. At Fort's instruction, Norris signed the drilling proposal on August 6, 1984, as "assistant treasurer, PSC", returned it to Phillips and reported back to Hug. Phoenix at this time was a debtor-in-possession having filed a Chapter 11 case in August 1983.

Phoenix' accounts payable department on December 5, 1984, received Phillips' invoice for $828.50 together with a statement of joint operations for October indicating the bill was for staking costs. Since Norris did not consider this a production cost, he sent Phillips a DIP check for the invoice amount.

Phillips commenced drilling operations. It billed Phoenix on December 20 for $82,078, which represented one-half of drilling costs during November. Phoenix received this bill on December 31. It reached Norris January 2. He made repeated attempts before he was successful in reaching someone at Phillips with knowledge of this matter to ask that the drilling be stopped. By that time the well had been plugged and abandoned. Norris informed Phillips that since Phoenix was in bankruptcy it could not pay the invoice. Phillips then sent a final invoice for $215,378.02, one-half of the actual drilling costs.

On March 22, Phoenix' attorneys notified Phillips of the reasons why Phoenix refused payment. Phillips took no action before Phoenix' plan was confirmed in July 1985. It was not until 1987 that Phillips took any action with respect to its claim. It filed a proof of claim in June in Phoenix' second reorganization case that had been filed April 20, 1987; and in July, it sued Norris individually for breach of warranty of authority to bind Phoenix.

Phillips contends it is entitled to a judgment of $215,387.02 against either Norris individually or Phoenix under the terms of the drilling proposal because Norris either breached his warranty of authority or he had authority to bind Phoenix. Thus, its claim is entitled to priority status in Phoenix' present Chapter 11 case as an unpaid administrative expense of the first case.

The present corporate officers acknowledge that Norris in approving the drilling proposal acted as a corporate officer with the approval of senior corporate officers, but that Phoenix cannot be liable because it did not have capacity to enter into any transaction out of the ordinary course of business without court approval. Phillips counters that Norris is then liable for impliedly misrepresenting Phoenix' capacity to enter into the drilling proposal.

■ In the first instance, Norris had authority to sign the proposal and is not liable. It was signed at the direction of his supervisor which action was ratified by the president and CEO of Phoenix.

■ The next question is whether approval of the drilling proposal created a contract under which Phoenix is liable for one-half the drilling costs. The answer turns upon the meaning attached to the July 26, 1984 letter.

*Restatement (Second) of Contracts* § 20 (1981) provides:

There is no contract for lack of assent when the parties attach materially different meanings to their manifestations and ... (a) Neither party knows or has reason to know the meaning attached by the other. *See* 1 Williston, Contracts §§ 94–95 (3rd Ed.1957) 3 Corbin, Contracts § 599 (1960 & Supp 1984).

The terms *operator* and *joint account* have standard meanings within the oil and gas industry:

"Joint account" shall mean the account showing *the charges paid* and credits received in the conduct of the Joint Operations *and which are to be shared by the Parties.* (emphasis added)

"Operator" shall mean the party designated to conduct the Joint Operations.

*Accounting Procedure for Joint Operations* promulgated by Council of Petroleum Accountants Societies of North America.

Phillips, a major in the oil and gas industry, intended the standard meaning which would result in a 50–50 working interest.

Norris on the other hand, although an accountant, had no experience in that industry and approved the proposal based upon his understanding of the historical relationship between Phoenix and Phillips. The only activity under that relationship had been the receipt by Phoenix of insignificant royalties as a result of the farmout agreements. The meaning he attributed to the proposal was that Phoenix' approval was required because of its interest in the mineral rights at the proposed drilling site and that Phoenix would share in any resulting royalties. Thus, Phoenix and Phillips had materially differing views as to the meaning of the proposal but neither party knew the meaning attached by the other.

The test then is whether Phoenix had reason to know the meaning attached by Phillips and vice versa.

Phillips did not have reason to know that Phoenix because of its historical relationship with Phillips and its debtor-in-possession status considered the proposal a means of continuing to receive royalty payments without any monetary obligation on its part. At the time of mailing the proposal, Phillips had not received actual notice of Phoenix' Chapter 11 case.

Nor did Phoenix have reason to know that Phillips intended a 50–50 working interest rather than a royalty interest. Phillips points to the earlier farmout agreements to which were attached the definitional index of the standard industry terms it used in its proposal as the basis for Phoenix to know Phillips' meaning. That position is unreasonable in light of the dearth of activity between Phillips and Phoenix over a considerable length of time and Phillips' failure to attach the index to the proposal in accordance with its standard practice. Because Phoenix' past participation consisted only of receipt of royalty payments, the bare proposal is insufficient to hold that Phoenix had reason to know that this proposal had a meaning different from their past relationship.

Neither party having any reason to know the materially different meanings each attached to the drilling proposal reflects a lack of assent. Since no contract came into being, neither Phoenix nor Norris is liable to Phillips for one-half of its drilling costs.

■ Assuming *arguendo* that a contract arose, Phillips is not entitled to administrative expense priority status in Phoenix' second Chapter 11 case. In the first instance, Phoenix could not without court authority enter into a binding transaction out of the ordinary course of its business—making steel products. In the second instance, Phillips took no action whatsoever to assert any claim in the first case.

Phillips' contention that it would be denied due process if it were not given administrative priority status is not meritorious. Phillips asserts it should be excused from the requirement of filing a request for payment of an administrative expense[1] because it never received notice of Phoenix' bankruptcy. While Phillips did not receive formal court notice, such notice was not required. Phillips was not a pre-petition creditor. In January 1985, Norris through a series of telephone calls advised Phillips' personnel that because of Phoenix' bankruptcy it could not and would not pay Phillips. On March 22, Phoenix through its attorneys advised Phillips in detail of its position:

> Phoenix Steel Corporation, a Delaware Corporation (PSC), is presently operating as a debtor in possession under Chapter 11 of the United States Bankruptcy Code and has been so operating since August 1983.... Accordingly, please be advised that PSC has no intention of paying Phillips Petroleum's invoices which may have been rendered, or may be rendered by Phillips Petroleum with respect to the above-captioned well.

It is irrefutable that Phillips had actual oral and written notice of Phoenix' bankruptcy within the first three months of 1985. Some seven months after Norris' calls and four months after the March 22 letter, Phoenix' reorganization plan was confirmed on July 31, 1985. Phillips did not assert any claim in the first case and any claim it may have had was discharged

---

1. 11 U.S.C. § 503(a).

upon confirmation of Phoenix' plan. 11 U.S.C. § 1141(d)(1)(A).

 Again assuming *arguendo* that a contract arose, Norris did not breach any warranty of his authority as Phillips contends. As previously noted, he signed the "approved" space on the drilling proposal at the direction of his supervisor. This action was immediately ratified by the president and CEO of Phoenix. The fact that Phoenix lacked capacity to enter into a drilling contract in the absence of court approval does not amount to a breach of his warranty of authority. This follows from the general principles of the law of agency:

An agent no more warrants that his principal has full contractural capacity than he warrants that his principal is solvent. *Restatement (second) of Agency,* § 332, Comment A (1958).

These principles are of long standing. In *Hall v. Lauderdale,* 46 N.Y. 70 (1871), the Court held:

The defendant had authority, in fact, to make the contract. If the principal is not bound, it is not because the contract is not within the terms of the authority granted, but for the reason that it was *ultra vires.* The agent does not warrant due capacity of the principal to contract. *Id.* at 75.

Phillips' reliance on *Restatement (Second) of Agency* § 329 Comment A (1957) is misplaced. That section refers to the situation where the principal had capacity but did not authorize the agent to act. Section 332 of the *Restatement (Second) of Agency* which refines the principles of the *Hall* case is applicable:

§ 332. *Agent of Partially Incompetent Principal*

An agent making a contract for a disclosed principal whose contracts are voidable because of lack of full capacity to contract, or for a principal who, although having capacity to contract generally, is incompetent to enter into the particular transaction, is not thereby liable to the other party ...

Further, Norris is not liable under the next sentence in the preceding quoted paragraph which reads:

He does not become liable by reason of the failure of the principal to perform, unless he contracts or represents that the principal has capacity or unless he has reason to know of the principal's lack of capacity and of the other party's ignorance thereof.

Phoenix had capacity to contract in the ordinary course of business without court approval. Phillips' proposal as Norris understood it was in the ordinary course of business. This conclusion is reasonable in light of Norris' lack of experience in the oil industry. Moreover, Phillips conceded that "many terms in the oil industry" have "special meanings that you may not be aware of." (Tr. 235). Thus, the technical meanings of the terms "operator" and "joint account" were insufficient to put Norris on notice that the proposed transaction was outside the ordinary course of business.

An order is attached.

## ORDER

AND NOW, July 21, 1989, for the reasons stated in the attached Memorandum Opinion,

IT IS ORDERED THAT:

1. Judgment is entered in favor of Phoenix Steel Corporation and Francis J. Norris against Phillips Petroleum Company.

2. Phillips Petroleum Company is enjoined from proceeding with its suit against Francis Norris in the Superior Court of Delaware and shall dismiss its complaint.